IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 5, 2007 Session

## STATE OF TENNESSEE v. ROBERT S. BARNES

**Direct Appeal from the Circuit Court for Lauderdale County**
**No. 7426   Joseph H. Walker III, Judge**

---

**No. W2006-00578-CCA-R3-PC  - Filed September 4, 2007**

---

Following a jury trial, the petitioner, Robert S. Barnes, was convicted of reckless endangerment, attempted rape, robbery, aggravated burglary, and assault. For his convictions, the petitioner was sentenced as a career offender to an effective sentence of forty-five years for the felony convictions, plus consecutive sentences of eleven months and twenty-nine days for each of the two misdemeanor convictions. On direct appeal, this court affirmed the judgments of the trial court. *State v. Robert Sanford Barnes*, No. W2003-02967-CCA-R3-CD, 2005 WL 331376 (Tenn. Crim. App., at Jackson, Feb. 11, 2005). The petitioner filed a timely petition for post-conviction relief which the post-conviction court subsequently denied after an evidentiary hearing. The petitioner now appeals. In this appeal, the petitioner contends that his trial counsel was ineffective. Following a thorough review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. McLin, J., delivered the opinion of the court, in which John Everett Williams and Alan E. Glenn, JJ., joined.

Ryan B. Feeney, Selmer, Tennessee, for the appellant, Robert S. Barnes.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Tracey Brewer-Walker, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Background

On direct appeal, this court summarized the relevant facts of the case as follows:

Norris Patricia Wheeler testified that she is Mrs. Verness Johnson's sister, and, in July 2001, she lived about seven miles away from the Johnsons' house. She said that

Mrs. Johnson is seventy-eight years old. Wheeler testified that, on July 23, 2001, "sometime after lunch," Mrs. Johnson called "crying and screaming" that she had been raped and her husband had been injured. During this conversation, Mrs. Johnson told her that she was afraid to call 911 because the attacker threatened to kill her and her husband if she called the police. Wheeler said that, immediately after she spoke with Mrs. Johnson, she called 911, and then she and a friend went over to the Johnsons' house.

Wheeler testified that, when she arrived at the Johnsons' house, the police and paramedics were already at the house. She stated that paramedics were putting Mr. Johnson into an ambulance while the police were questioning Mrs. Johnson. Wheeler stated that, after the police were finished questioning Mrs. Johnson, she then drove Mrs. Johnson to the hospital where Mr. Johnson was being treated. On cross-examination, Wheeler testified that, during her initial conversation with Mrs. Johnson, Mrs. Johnson only identified her attacker as "a colored man."

Rita Burnett, an officer with the Ripley Police Department, testified that she was one of the first officers to arrive at the Johnsons' house on July 23, 2001. She said that she arrived within minutes of Wheeler's 911 call. Officer Burnett recalled that two other officers, Lieutenant Steve Sanders and Officer Richard Tidwell, both arrived at the same time she did. The officer testified that, when she arrived, "[M]r. Johnson was on the floor . . . Mrs. Johnson was screaming that he was dead and to get some help for him, and that someone had forced his way in, beaten her husband and d[one] things [to] her." Officer Burnett stated that Mrs. Johnson was clothed and was "hysterical." She said that she began trying to calm Mrs. Johnson down, while Officer Tidwell, a part-time paramedic, assisted Mr. Johnson.

Officer Burnett said that she gathered, from the crime scene, Mrs. Johnson's underwear, jeans, blouse, and two wash cloths used by Mrs. Johnson to "wash up," and she gave all of those items to Lieutenant Sanders as evidence. The Officer stated:

> [Mrs. Johnson] said that the [Defendant] had come in and just started beating [Mr. Johnson]. And then [the Defendant] had this fork and he was telling [Mrs. Johnson] to get in the room. And when she got in the room, [the Defendant] made her take her clothes off and get on the bed. Then [the Defendant] got on top of [Mrs. Johnson]. And [Mrs. Johnson] said that she asked [the Defendant] not to rape her, and he said that he wasn't. And he was humping on her and sucking on her breasts. And then [Mrs. Johnson] said that she believed that [the Defendant] must have gotten relieved because she felt something squirt all over her.

Officer Burnett said that Mrs. Johnson also told her that the Defendant went through Mr. Johnson's pockets, and then he asked Mrs. Johnson if she had any money. Mrs. Johnson said that the Defendant used a metal fork in his attack of the couple. The officer testified that she went to the hospital with Mrs. Johnson, and she witnessed Dr. Murray perform Mrs. Johnson's rape kit. Officer Burnett said that Mrs. Johnson's rape kit took about fifteen minutes to perform, and she recalled that Mrs. Johnson was still very upset during the examination.

The officer said that she was also present when Mrs. Johnson was shown a photographic line-up at the hospital, at 5:55 p.m. on the day of the incident, and asked to identify her attacker. She said that the police had the name of a suspect, and they included a picture of him in the line-up. The officer said that, before showing Mrs. Johnson the line-up, Mrs. Johnson said that she knew that her attacker's name was "Robert B. something" because he had been to the Johnsons' house earlier the day of the attack looking for work, and Mr. Johnson had written his name down at that time. Officer Burnett said that the names of the individuals pictured in the line-up were on the back of the line-up page, but Mrs. Johnson was not shown these names before she identified the Defendant. Officer Burnett explained that Mrs. Johnson took her time with the lineup "[b]ecause she said she didn't want to make a mistake," and, after taking her time, Mrs. Johnson identified the Defendant as her attacker. The officer said that the Defendant had a "lazy eye" as a distinguishing physical characteristic. Officer Burnett testified that no one made any suggestion to Mrs. Johnson about which person to identify. Officer Burnett then identified the Defendant in court as the man Mrs. Johnson picked out of the photo line-up.

Mrs. Johnson testified that, in July of 2001, she and Mr. Johnson maintained residences in both Jackson and Ripley, Tennessee, and they split their time between the two homes. She recalled that, on July 23, 2001, she and Mr. Johnson drove from Jackson to their home in Ripley, planning to spend the week there. She said that Mr. Johnson drove them in his truck and that, at that time, he did not have any problems driving, breathing, or otherwise. Mrs. Johnson testified that, upon arriving at their home in Ripley, they began unloading the car. She said that Mr. Johnson finished unloading his things first, and then he sat down at the kitchen table. Mrs. Johnson explained that she was about to go get another load from the car when she heard a knock at the door. She said that the side carport door of their home has both a wooden door and a storm door, and she usually locks both, but on that day she only locked the interior wooden door. She stated that, when she opened the wooden door, she noticed that the Defendant had wedged his foot between the two doors. She testified that the Defendant had a metal fork with him, and kept this fork with him throughout the entire incident. She said that the Defendant "grabbed" her, and she began screaming. Mr. Johnson "jumped up from the table" to protect her, and then the Defendant grabbed Mr. Johnson. She testified that the Defendant choked Mr. Johnson, and Mr. Johnson fell to the ground. Mrs. Johnson explained that she

begged the Defendant to quit, and offered him money. She said that the Defendant began dragging Mr. Johnson to the back bedroom, and, because she was concerned that Mr. Johnson would be further injured, she helped the Defendant drag Mr. Johnson. She stated that she thought Mr. Johnson was dying. She stated that the Defendant would not let her help Mr. Johnson, telling her that Mr. Johnson was not hurt and she "better be quiet, shut up."

Mrs. Johnson testified that the Defendant took her into her bedroom and made her lie down on the bed. She explained:

> [The Defendant] made me get up on my bed . . . [and he] tried to make me take my clothes off. And I don't remember, I was so scared and frightened, I don't remember taking my clothes off at all. I know I took part of my-one of my arms out of my bra . . . and he nursed my breasts, but he never did go up in me.

Mrs. Johnson stated that she told the Defendant she had an incurable sexually transmitted disease. Mrs. Johnson testified that she had seen the Defendant once before, when he came looking for work. She said that "when [she and Mr. Johnson] got to Ripley" the Defendant approached Mr. Johnson and asked for work, and Mr. Johnson told him that he would let the Defendant know if he had any work for him in the future. She said that, after the incident, as the Defendant was leaving her house, the Defendant demanded the twenty dollars she had previously offered to him. She said that the Defendant also searched Mr. Johnson's pockets. Mrs. Johnson stated that she did not give the Defendant permission to enter her house or to touch her. Mrs. Johnson identified the photographic line-up from which she had previously identified the Defendant as her attacker, and she again identified the Defendant as her attacker.

Cheryl Manns testified that she is the custodian of records at the Lauderdale County Baptist Memorial Hospital. Manns produced and testified about Mrs. Johnson's medical records from the night of July 23, 2001. She said that, according to the hospital records, Mrs. Johnson arrived at the hospital at 3:20 p.m., and, at 3:39 p.m., Mrs. Johnson was admitted and treated by Dr. Murray. She said that Mrs. Johnson was experiencing pain on the right and left side of her chest. Manns said that, according to the records, Mrs. Johnson's daughter signed the records because, due to Mrs. Johnson's condition at the time of admission, she was unable to sign. The records indicated that Mrs. Johnson suffered from an "alleged sexual assault." Manns also testified about Mr. Johnson's medical records from that evening, and she stated that he was diagnosed with "asphyxiation, strangulation injury, and new right hemiparesis." She testified that the records indicated that Mr. Johnson had a one-inch long laceration on his forehead and suffered shortness of breath.

Dr. Darrell Murray testified that he was working in the emergency room at the Lauderdale County Baptist Memorial Hospital on the evening of July 23, 2001, and he recalled treating Mrs. Johnson. Dr. Murray said that Mrs. Johnson came to the hospital because of an alleged rape, and he conducted a "rape kit" on Mrs. Johnson. He testified that Mrs. Johnson's physical exam revealed that the alleged assault did not result in penetration, and on the rape kit he indicated that there was attempted penetration of the vagina. He said that the swabs taken during a rape kit examination are sent to a laboratory for microscopic examination to detect the presence of sperm.

Special Agent Lawrence James, a special agent and forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified as an expert witness on DNA analysis. Agent James testified that, during this investigation, he analyzed the panties, blue jeans, blouse, two wash cloths, the rape kit, and swabs taken from the victim, which were all submitted to the TBI crime lab for testing. He noted that the rape kit victim information sheet stated that the victim had no consensual sexual activity in the seventy-two hours preceding the incident on July 23, 2001. Agent James testified that the tests conducted revealed the presence of sperm, and he matched the Defendant's DNA to DNA present on Mrs. Johnson's blue jeans. The agent said he was unable to get a DNA profile from the sperm sample found on the vaginal swabs because the sample was too small. The agent said that he did not examine or test the other items because the DNA match from the jeans was sufficient to determine from whom the sperm originated.

Samantha Wolfe testified that she works at the Jackson-Madison County General Hospital as the custodian of records, and she testified about Mr. Johnson's medical records. Wolfe said that, according to the records, Mr. Johnson was diagnosed with "acute left hemisphere cerebrovascular accident secondary to internal carotid occlusion." The records also indicated that Mr. Johnson was diagnosed with "chronic aspiration syndrome, secondary to [the above condition]. . . ." The records indicated that Mr. Johnson received intensive neurological care, but continued to suffer from dense right hemiparesis. Wolfe testified that the transfer form from the Ripley hospital indicated that Mr. Johnson had suffered a twenty minute loss of consciousness, resulting from strangulation, and that his symptoms were "unobtainable from [Mr. Johnson] due to a dense aphasia." Wolfe continued, noting several more descriptions of neurological damage and injuries to the neck and area of the carotid artery, all of which were caused by strangulation.

Elaine Matthews, the Johnsons' daughter, testified that, before the incident in July 2001, she frequently visited her parents, in Jackson and in Ripley, and her father was an active man. Matthews testified that, on July 23, 2001, she drove to Ripley immediately after receiving a call from her mother about the attack. She testified that her mother told her that "Robert B." attacked her and that Mr. Johnson knew him.

Lieutenant Steve Sanders, an investigator for the Ripley Police Department, testified that, when he arrived, he found Mrs. Johnson screaming that her husband was dying. He said that he followed Mrs. Johnson down the hall to locate Mr. Johnson, and he found Mr. Johnson lying on his back on the bedroom floor, gasping for breath. The lieutenant stated that, when Mrs. Johnson was more calm, she told the officers what happened, and told the officers that she knew the man who had attacked her as "Robert B." Lieutenant Sanders recalled that Mr. Johnson was in "serious condition" and had red marks on his neck and a laceration on his forehead.

Lieutenant Sanders said that he knew of two men by the name of "Robert B." in the area, one of whom was the Defendant. He said that the Defendant lived within a quarter mile of the Johnson's house, and he decided to place the Defendant's picture in a photographic line-up with several other men to show to Mrs. Johnson. The lieutenant said that he placed the names of the individuals on the back of the line-up, and he showed it to Mrs. Johnson, with the name-side down. He said that she carefully reviewed the photographs and then identified the Defendant as the man who attacked her. Lieutenant Sanders testified that he searched for the Defendant, both in and out of Tennessee, and he ultimately located the Defendant in Tampa, Florida. He explained that, after locating the Defendant, he obtained a blood sample that he submitted to the TBI for comparison to the sperm found on Mrs. Johnson's blue jeans. He said that he received a report from the TBI crime lab indicating that the Defendant's DNA matched DNA found on Mrs. Johnson's blue jeans.

The Defendant testified that his most recent address in Ripley, Tennessee was on Chickasaw Street, and he has not resided with his grandmother at 206 Cleveland, which is on the Johnsons' street, since 1993. The Defendant said he did not commit any of the crimes that he is charged with. He testified that he is five feet and eleven inches tall and weighs 185 pounds, and, in July of 2001, he was a weightlifter and weighed 210 pounds. He noted that his most distinguishing physical feature is his "bad eye." The Defendant said that he is a handyman and works various odd jobs. He recalled that, on July 23, 2001, he went to a neighbor's house to mow the yard and wash the car. After completing his work there, he went over to Mrs. Johnson's house. He testified that, when he arrived at around 11:00 a.m., Mr. Johnson was not at home, and Mrs. Johnson was standing between the doors. He said that he asked if she had any work for him to do, and she told him no but invited him in. The Defendant testified that he informed Mrs. Johnson that he needed money. Mrs. Johnson told the Defendant that he was dirty, and he explained that he had been doing yard work for his neighbor. The Defendant testified that he had been to the Johnsons' several times prior to this day, and he and Mrs. Johnson "would always talk and things like that." He said, "[Mrs. Johnson] would always touch me on the arm, touch me on the hand." He explained that he did not think Mrs. Johnson intended anything sexual in these actions at first, but he later realized that she "had a special liking for [him]."

The Defendant testified that he "always" asked Mrs. Johnson for money, and on that day, he again asked Mrs. Johnson for money. He said that she responded that he "never pay[s][her] back." He said that they continued talking and "one thing led to another." He said that Mrs. Johnson carried some money into the bedroom and placed it on the bed, and she took her clothes off. He testified that he did not want to have intercourse with her, but when she "touched [his] private spot" over his pants, he became physically aroused and removed himself from his pants. He stated that he requested that she perform fellatio on him, which she declined, but she "held it, and was playing with it." He said that, when he climaxed, his semen must have fallen onto her pants. The Defendant testified that, afterwards, he asked her for money, and she gave him twenty-three dollars. He said that Mrs. Johnson went into the bathroom, where he said he heard the water start running, and returned with a wet soapy towel and wiped him off. He estimated that, at this point, it was approximately 11:25 a.m. The Defendant denied threatening Mrs. Johnson or wielding a fork. He said that he never nursed Mrs. Johnson's breasts. He testified that he left the house at approximately 11:45 a.m.

The Defendant testified that, after leaving the Johnsons' house, he began to walk down Cleveland street, where Michael Bates, who happened to be driving by, stopped and gave him a ride to meet with his probation officer and his parole officer. The Defendant testified that he did not return to the Johnsons' house after the prior visit. He said that he had known the Johnsons for approximately fourteen years, having done work for Mr. Johnson's uncle and having met Mrs. Johnson approximately fourteen or fifteen times.

Robert Madden testified that the Defendant came to his office for an appointment on July 23, 2001, and he produced a report sheet to support this. He said that he was unable to locate the time sheet, but he believed the Defendant came to his office sometime before lunch, estimating that it was mid-morning, around 10:00 or 10:30 a.m. On cross-examination, Madden testified that he could not be sure what time the Defendant came to his office.

Austin Thompson, Jr., testified that he was aware of the incident that occurred at the Johnsons' house in 2001, but he did not remember the specific day that it occurred. He said that he remembered that the Defendant came to his house to do yard work. On cross-examination, Thompson admitted that he did not know whether he saw the Defendant on July 23, 2001.

*Barnes*, 2005 WL 331376, at *1-6.

## II. Post-Conviction Hearing

At the post-conviction hearing, the petitioner's pretrial counsel testified that she worked as an assistant public defender and was appointed to represent the petitioner in general sessions court. According to pretrial counsel, there was a two year delay between the time the petitioner had committed the criminal offenses and the time he was charged. Pretrial counsel explained:

> [W]hen the case originally occurred and [law enforcement] were investigating, [the petitioner] left Lauderdale County and I believe went to the state of Florida, and was down there for period of time . . . . [W]hen he came back to Lauderdale County I think is when the case picked up and they further prosecuted it.

Pretrial counsel testified that at the time of the preliminary hearing, the victim, Mrs. Johnson, had difficulty identifying the petitioner as the person who attacked her. The case was nevertheless bound over to the grand jury. After the petitioner was indicted, pretrial counsel withdrew whereupon the district public defender (trial counsel) took over the petitioner's case. Pretrial counsel noted that although the victim had difficulty identifying the petitioner at the preliminary hearing, both she and trial counsel were aware that the victim had made a positive photographic identification of the petitioner soon after she was attacked. Pretrial counsel noted that at the time of her representation of the petitioner, his identity was an issue. However, pretrial counsel left the decision to file a motion to suppress the photographic lineup with trial counsel.

Pretrial counsel testified that on May 18, 2003, after the preliminary hearing, the petitioner wrote a letter of complaint and sent the letter to the Board of Professional Responsibility. In the letter, the petitioner asserted that his constitutional rights were being violated as the sheriff's department was repeatedly pulling him out of jail in an effort to get him to make a statement. Pretrial counsel stated that once the petitioner invoked his right to have an attorney present, the petitioner was no longer approached by the sheriff's department. Pretrial counsel said that at no time did the petitioner express displeasure with her representation or ask her to withdraw as his attorney. Pretrial counsel could not recall whether she discussed sentencing with the petitioner as he had yet to be indicted by the grand jury at the time of her representation.

Trial counsel testified that he had been the district public defender since 1990. He undertook representation of the petitioner some time after the petitioner's preliminary hearing. Trial counsel stated that he was familiar with the victim's testimony at the preliminary hearing. Although he was aware of the victim's difficulty in identifying the petitioner at the preliminary hearing, he did not file a motion to suppress the victim's identification of the petitioner from the photographic lineup because the identification was made shortly after the victim was attacked and there was no indication that the photographic lineup was unduly suggestive. However, trial counsel noted that he utilized the victim's testimony from the preliminary hearing in effort to impeach her identification of the petitioner at trial.

According to trial counsel, the petitioner admitted to being at the victim's home on the day the crimes took place. As a result, the defense theory at trial was not identity. Trial counsel explained: "It was basically that [the petitioner] had gone [to the victim's home] earlier in the day,

had left, and what we attempted to do was show that [the petitioner] didn't go back during the time frame that was alleged by [the victim]."

Trial counsel testified that he met with the petitioner at least six times and that this defense strategy was discussed with the petitioner prior to trial. Trial counsel did not recall whether he discussed sentencing issues with the petitioner but asserted that such discussion was normally part of his representation. Trial counsel explained:

> I would have met with [the petitioner] and told him what's he's charged with and the range of punishment for each of those charges. And that happened to be, I believe, four Class B felonies and one Class C felony. And each Class B felony – and they had given us notice that he was a career offender. Each Class B felony would carry up to 30 years. I would have told him that.
>
> . . . I have no specific recall. But I would have gone over with him the statute that deals with consecutive versus concurrent sentences.

However, trial counsel did recall discussing the petitioner's status as a career offender, stating:

> [I]t was my opinion, and we discussed this, that there was a problem with the State's notice of [the petitioner] being a career offender, which I addressed to the Court during sentencing and also on appeal. Evidently . . . the Court didn't agree with my feelings on that, but we discussed that in detail.

Trial counsel testified that the petitioner was ultimately convicted of three Class C felonies and two misdemeanors and received an effective sentence of forty-seven years at sixty percent. Although he did not specifically tell the petitioner that he would face up to forty-seven years, he told the petitioner that he was looking at thirty years for each B felony charged in the indictment. Trial counsel denied telling the petitioner he would not get a sentence greater than fifteen years total. Trial counsel said:

> No, I never assured him, because I don't make promises. Now, I might have told him . . . after his convictions . . . I think that [he] probably won't get more than 15 years here or 16 or 17 years. But I didn't tell him at any time that he would only get 15 years.

Trial counsel stated that he and the petitioner did not discuss the petitioner's willingness to pursue plea negotiations with the state because "[t]here was never a plea offer." Trial counsel also noted that he was surprised when the trial court ordered the defendant to serve his sentences consecutively rather than concurrently.

Trial counsel testified that he met with the petitioner a number of times. During these meetings, the petitioner told him of his whereabouts the day of the crimes and provided names of

witnesses who could corroborate his story. Trial counsel stated that he contacted or attempted to contact these potential witnesses. He recalled that the petitioner gave him the name of Kendrick Lee. According to the petitioner, Mr. Lee gave him a ride to a convenience store where the petitioner cashed a check around the time the crimes occurred. However, Mr. Lee could not be located though trial counsel attempted to contact him several times. On one occasion, he spoke with Mr. Lee's parents concerning his whereabouts and he was told that Mr. Lee had gone to Indiana and could not be reached. Trial counsel also recalled that either Eilene Palmer or Ms. Cannon[1] would have testified that the petitioner mowed her yard the morning of the crimes. Although trial counsel could not remember the details, he recalled that one of the two women was deceased.

Trial counsel testified that some of the potential witnesses listed by the petitioner could not be reached, or they were not material to the petitioner's defense. However, other witnesses testified on behalf of the petitioner. According to trial counsel, the petitioner's probation officer, Robert Madden, testified that the petitioner went to see him the day of the crimes. Another witness, Austin Thompson, testified that the petitioner worked on his yard on the day of the crimes. Trial counsel reiterated that the petitioner's identity was irrelevant because the petitioner admitted that he had been at the victim's house the day the crimes took place. Trial counsel noted that he did not know the petitioner was going to testify until right before the petitioner took the stand.

Trial counsel testified that he hired a private forensic laboratory to analyze the TBI's DNA analysis, which connected the petitioner to the crime. Trial counsel explained:

> I had a referral concerning a DNA expert who works in the Arkansas forensic laboratory, who does private work. His name is Kermit Channel. I called him and talked to him, and he told me to get the report from the TBI concerning their DNA analysis, which I did.
>
> . . . Mr. Channel [was] to look at their analysis . . . and see if he could detect anywhere from their lab work that they may have made a mistake in connecting [the petitioner's] DNA to the DNA that they found on the [victim's] blue jeans.
>
> . . . [H]is conclusions [were] that there was no mistake . . . .

Trial counsel stated that he did not call Mr. Channel as an expert witness because Mr. Channel's findings confirmed the state's conclusion that the petitioner's DNA was found on the victim's clothes. Trial counsel said he was not surprised by Mr. Channel's findings because the petitioner admitted to having sexual contact with the victim which resulted in sperm being produced at the crime scene.

The petitioner testified that his pretrial counsel did not represent him properly because she failed to file a motion to dismiss the charges against him when the victim could not identify him as

---

[1] No first name is provided in the record.

her assailant at the preliminary hearing. The petitioner stated that he complained about pretrial's representation in a letter addressed to the Board of Professional Responsibility. The petitioner testified that he only met with trial counsel three times prior to his trial. The petitioner complained that he informed trial counsel that the victim made mistakes in identifying him as her assailant, but yet, trial counsel failed to develop an adequate defense strategy. The petitioner said he believed that a detective coerced the victim into identifying him at the photographic lineup.

The petitioner testified that his trial counsel should have explained to the jury the erroneous DNA test results. The petitioner stated:

> That right there could have changed things. They already took one DNA test from me that said negative in prison. Then they come back and took another DNA test. It said negative, and they took an ink pen and marked through it and wrote in positive. I asked [trial counsel] how come he don't show that to the jury . . . . If it said negative, why did they mark through it with an ink pen and wrote positive?

The petitioner recalled that trial counsel told him to be patient, however, the petitioner recounted that "I jumped up myself and said something, and Your Honor told me to sit down. I jumped up again, trying to explain to them this [report] right here can show the jury that I didn't do this." The petitioner then recounted that he jumped up several times at trial and punched trial counsel to let him know to address the lies the witnesses were telling. He stated "I done everything but kicked him. I punched, said '[trial counsel]' she lying now. You caught her in a lie now. Now catch her. Put perjury charges on her."

The petitioner testified that he gave a list of potential witnesses to trial counsel. However, trial counsel failed to investigate some of these witnesses. The petitioner explained that his aunt, Eilene Palmer, would have testified that he did not live in the area where the crimes occurred. He said:

> Well, they saying that I was living on Cleveland Street, which is right down the street from where . . . [the crime] happened at. But I wasn't living on Cleveland Street. Last time I lived on Cleveland street was in 1994. I just got out of prison. I did eight years. I got out in 2001. I was living with my Aunt Eilene. Me and my Aunt Eilene had a altercation, and [I was taken] out to 19 to Roland and Martha Lee's house, and I was living in their trailer. The next day is when this went on.

According to the petitioner, trial counsel told him that Eilene Palmer was dead, but the petitioner later discovered she was not dead. The petitioner insisted that Eilene Plamer would have verified that he was living "at least 15, 20 miles away" from the crime scene. However, the petitioner admitted that he told the jury that he went over to the victim's house.

The petitioner testified that he was unsatisfied with the representation of counsel at trial but did not inform the court there was problem. He explained:

I had got up so much the judge told me . . . if I get up again or make any other outburst, they're going to have the trial without me. And I know I was doomed then. So I had to sit there and bite that bullet. I had got up . . . six times a day, so that lets you know there was problem.

The petitioner asserted that trial counsel did not explain consecutive sentencing and told him that he "wasn't going to get no more than 10 to 15 years." The petitioner further asserted that he would have instructed trial counsel to make plea offer had he known there was a possibility of getting 47 years.

In a written order, the post-conviction court denied relief. The court accredited the testimony of trial counsel and noted that "[s]ome statements of the [p]etitioner at this hearing were beyond belief." After specifically addressing the petitioner's allegations, the court found that the petitioner failed to prove his allegations by clear and convincing evidence.

### III. Analysis

In order for a petitioner to succeed on a post-conviction claim, the petitioner must prove the allegations set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is de novo with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is de novo without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

In order to establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards. *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases). A fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. Prejudice is shown if, but for

counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id*. at 697. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id*. In considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984).

On appeal, the petitioner contends that he received the ineffective assistance of his trial counsel. In particular, the petitioner first claims that trial counsel was ineffective for failing to challenge the victim's identification of the petitioner from a photographic lineup. The petitioner submits that without this identification "the issue of the identity of the assailant would have been much more difficult to establish."

In denying this particular claim, the post-conviction court accredited the testimony of trial counsel and found the following:

> [Trial counsel] was not deficient in handling any issue with regard to identity. The [petitioner] maintained that he was at the scene of the crimes, which was confirmed by DNA. The [petitioner] maintained that his actions were not a crime, but consensual sex. He denied the other crimes. [The petitioner] told [trial counsel] that the victims knew him and [the petitioner] never gave his [trial counsel] reason to file a motion to suppress the photo identification.

Upon review, it is abundantly clear that the record does not preponderate against the post-conviction court's findings. Notwithstanding the victim's photographic identification of the petitioner, there was ample proof, including the petitioner's own testimony, which placed the petitioner at the victim's house and connected him to the crimes. Accordingly, we conclude that the petitioner has failed to show either deficient performance by counsel or resulting prejudice, and the issue is without merit.

The petitioner next claims that trial counsel failed to diligently pursue investigation of potential alibi witnesses such as Kendrick Lee and Eilene Palmer. However, the petitioner failed to present these witnesses at the evidentiary hearing. In order for a petitioner to establish he was prejudiced by his attorney's failure to discover, interview, or present a witness at trial, the petitioner must have this witness testify at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a witness or what that witness' testimony might have been if introduced by defense counsel." *Id*. As such, the petitioner's failure to call these potential alibi witnesses at the post-conviction hearing precludes our review of this issue. In addition, the record reflects that trial counsel diligently pursued investigation of all potential defense witnesses and certain witnesses could not be located or were not relevant to the petitioner's defense. Furthermore, the petitioner's claim would ignore his own

-13-

testimony that he visited the victim's home and at such time had consensual sexual contact with the victim. Given petitioner's testimony at trial, we fail to see how trial counsel was deficient in not pursuing an unworkable alternative theory of mistaken identity and alibi. Clearly, the petitioner has failed to prove counsel's performance was deficient and that there is a reasonable probability that, but for counsel's alleged error, the outcome of the proceeding would have been different. The issue is without merit.

The petitioner next claims that counsel was ineffective by failing to investigate a check the petitioner alleges he received from Ms. Cannon and cashed on the day of the crimes. Specifically, the petitioner asserts that "the date and time stamp placed on the check by the bank would have established the petitioner's whereabouts with certainty at a particular time and could have helped buttress the other testimony as to the petitioner's course of actions on that day, all serving to establish his alibi at the time of the crime." In our view, the petitioner's argument is once again misplaced. The petitioner offered no proof at the evidentiary hearing to support this claim. In contrast, however, trial counsel testified that he contemplated investigating the check but did not because the time frame in which the petitioner allegedly cashed the check did not correlate to the time of the crimes. We note that the post-conviction court accredited the testimony of trial counsel and found that he was "not deficient in handling any issue regarding identity." Furthermore, as previously noted, the petitioner testified that he was at the crime scene, and his testimony was corroborated by the victim's testimony as well as DNA evidence. As such, we conclude that the trial court properly found that the petitioner failed to prove this allegation by clear and convincing proof and is not entitled to relief.

The petitioner next claims that trial counsel was ineffective in failing to object to the admission of the DNA test report connecting the petitioner to the crime scene because the report indicated a "negative result," thus rendering the report inadmissible. However, the record of the petitioner's trial reflects that trial counsel effectively raised this inconsistency. When questioned by trial counsel, Special Agent Lawrence James explained that he found the presence of sperm after he conducted a second test; therefore, he marked out the initial "negative" finding and marked the finding "positive." Also, the record shows that the petitioner relied on the DNA report to support his testimony that he had consensual sexual contact with the victim earlier in the day and it was someone else who later attacked the victim. When asked why his DNA profile matched the sperm found on the victim's pants, the petitioner responded:

> [The report] got the "Exhibit R. Barnes," which stands for Robert Barnes, which would be me. Now they said also that they found it in the blue jeans. Now, if they found it in the blue jeans, then that would be making me tell the truth, because if I'm standing up and ejaculate, it would drop down into the [victim's] pants.

> But now I ask you to look at this closely. There was nothing found in her vagina that said it was mine, but they also said that there was some in the swab. Now, you going to go back up and look at that where it says that? Because it said

that there was some in the swab. So that means either one of two things, that somebody else was there or somebody came after me.

In other words, the record indicates that the petitioner conceded at trial that he left DNA evidence at the crime scene. Furthermore, trial counsel testified that he privately retained a defense expert, who confirmed the veracity and authenticity of the state's DNA report. In its order, the post-conviction court found no merit to this allegation. We agree. This allegation fails for lack of proof and is entirely without merit.

The petitioner next claims that trial counsel was ineffective in failing to advise him on the possibility of consecutive sentencing. Specifically, the petitioner asserts that trial counsel knew that the petitioner was eligible for consecutive sentencing, yet he said the petitioner would get between 15 to 17 years if convicted. The petitioner asserts, that if he had known he was subject to a potential sentence of 140 years,[2] he would have insisted on entering into plea negotiations with the state.

At the post-conviction hearing, trial counsel testified that he generally told his clients of the possible sentences they might receive if convicted. According to trial counsel, he would have told the petitioner that he faced up to 30 years for each Class B felony charged in the indictment. He also would have gone over the statute that dealt with consecutive versus concurrent sentences. The post-conviction court accredited the testimony of trial counsel and found there was no deficiency. We agree. The record is devoid of evidence to support the petitioner's claim that trial counsel failed to tell the petitioner about the possibility of consecutive sentencing. Furthermore, the petitioner has failed to establish prejudice by clear and convincing evidence, i.e., that but for his attorney's alleged failure to inform him of all the potential sentencing consequences, he would have pled guilty and faced the same potential sentencing consequences. Also, the petitioner failed to present any evidence of a plea offer by the state. Therefore, we conclude that the petitioner has failed to carry his burden. The issue is without merit.

Finally, the petitioner claims that the post-conviction court erred when it analyzed his allegations solely under the standard set forth in *Strickland v. Washington* without consideration of the standard enunciated in *United States v. Cronic*, 466 U.S. 648 (1984).

Upon review, we initially note that this claim the petitioner now raises on appeal was not made in his petition or argued to the post-conviction court at the evidentiary hearing. As such, this claim is waived. *See* Tenn. Code Ann. § 40-30-106(d); *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001); *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

However, notwithstanding waiver, the petitioner's claim is without merit. In *Cronic*, the United States Supreme Court explained that:

---

[2] The petitioner calculates his potential sentence by adding together 30 years for each Class B felony he was charged with, and 15 years for the Class C felony, and 5 years remaining on a prior sentence.

[t]he right to the effective assistance of counsel is thus the right to require the prosecutor's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted-even if defense counsel may have made demonstrable errors-the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.

*Cronic*, 466 U.S. at 656-657. The Court then noted limited "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id*. at 658. The Court cited such circumstances as: (1) the complete denial of counsel where the accused is denied the presence of counsel at a critical stage; (2) where counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and (3) where counsel is available to assist the accused during trial, but the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial. *Id.* at 659-60.

The Supreme Court later clarified that "[w]hen we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the *attorney's failure must be complete*. We said 'if counsel *entirely* fails to subject the prosecution's case to meaningful adversarial testing.'" *Bell v. Cone*, 535 U.S. 685, 696-97 (2002) (quoting *Cronic*, 466 U.S. at 659) (emphasis added). The Court then explained that if a petitioner's claims are based on specific errors rather than a complete failure by counsel to subject the prosecutor's case to meaningful adversarial testing, then counsel's performance is subject to *Strickland's* two-prong test based on performance and prejudice. *See id.* at 697-98. In this case, the petitioner does not provide any evidence to support a claim that trial counsel's errors essentially amounted to a complete denial of counsel. Therefore, *Cronic* is inapplicable, and the petitioner is not entitled to relief.

## CONCLUSION

The petitioner has failed to meet his burden of proof regarding his claims of ineffective assistance of counsel and the post-conviction court correctly denied the petition. Therefore, the judgment of the post-conviction court is affirmed.

_____
J.C. McLIN, JUDGE

-16-